J-S05017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: W.A.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1170 WDA 2022 |

Appeal from the Decree Entered September 6, 2022
In the Court of Common Pleas of Jefferson County, Orphans' Court at
No(s):  23A-2022 O.C.

| | | |
|---|---|---|
| IN RE: J.L.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1171 WDA 2022 |

Appeal from the Decree Entered September 6, 2022
In the Court of Common Pleas of Jefferson County, Orphans' Court at
No(s):  No. 22A-2022-O.C.


BEFORE:  BENDER, P.J.E., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED: MARCH 6, 2023**

A.S. (Mother) appeals[1] from the decrees,[2] entered in the Court of Common Pleas of Jefferson County, Orphans' Court Division, involuntarily terminating her parental rights to her minor twin sons, W.A.S. and J.L.S. (Children) (born Oct. 2020). Because Mother remains incapable of successfully parenting Children and providing for their physical and mental well-being, we affirm.

Jefferson County Children and Youth Services (CYS) caseworker, Rebecca Sallack, received a report that Mother presented to the emergency room at the Punxsutawney Hospital with then-three-and-a-half-month-old J.L.S., who had bruises on his arm and leg.[3] While Mother at first denied hurting J.L.S.,[4] she ultimately admitted to having caused some of the bruising by squeezing J.L.S.'s arm and leg.[5] Children were living with Mother at their

_____

[1] Mother has complied with the dictates of **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), by filing a separate notice of appeal for each Orphans' Court docket number. **See In re: M.P.**, 204 A.3d 976 (Pa. Super. 2019) (applying **Walker** holding in termination of parental rights context).

[2] On October 28, 2022, our Court *sua sponte* consolidated these appeals as they involve related parties and issues. **See** Pa.R.A.P. 513.

[3] Police found a wood clamp in maternal grandparents' home that had a shape which was consistent with the shape and size of the bruise on J.L.S.'s arm. N.T. Termination Hearing, 8/30/22, at 60.

[4] Mother, in fact, first accused her father of hurting J.L.S. *Id.* at 58.

[5] Mother was immediately arrested and incarcerated. On August 30, 2022, Mother entered the ARD program on third-degree felony charges after entering a guilty plea for endangering the welfare of a child, simple assault, and harassment. Mother was still on probation at the time of the termination hearing.

maternal grandparents' home at the time of the incident. Maternal grandparents' home was determined to not be a safe environment for Children and an emergency protective custody order was entered. W.A.S. and J.L.S. were immediately removed from the home and placed in kinship care.

Children were adjudicated dependent on February 23, 2021. On April 13, 2021, Children were placed in a pre-adoptive foster home, where they remain to date. CYS established the following family service plan for Mother: undergo drug and alcohol evaluation and follow all recommendations; obtain a psychological evaluation[6] and follow recommendations; participate in anger management classes; notify CYS within 7 days of any address or telephone changes; participate in and complete nurturing parent classes; engage in supervised visits with Children, confirm attendance at visits at least 24-hours in advance; and provide diapers, wipes, formula, and baby food for visits. *Id.* at 6.[7] Child permanency plans, which were instituted in March 2012 and

_____

[6] Mother presented with a history of bipolar disorder, was medicated for the condition, and ordered to continue therapy to help treat her depressive mood.

[7] The service plan was revised in September 2021 after Mother had completed her drug and alcohol evaluation, anger management class, nurturing parent class, and had obtained a psychological evaluation. *Id.* at 7. The new plan recommended that Mother continue with mental health counseling and follow recommendations, take all medications as prescribed, obtain a court-ordered psychiatric evaluation, openly communicate with CYS with regard to any "concerns, issues, and any changes," transfer parenting skills learned in the nurturing parent classes to visits with Children, obtain stable housing, and keep CYS caseworker informed of any new addresses. *Id.* at 7-8.

*(Footnote Continued Next Page)*

revised throughout October 2021, were implemented and included: participation in early head start programs; weekly two-hour visits with Mother at CYS; age-appropriate stimulation and activities for Children; early intervention evaluations; and participation in physical therapy. *Id.* at 10-13.

Permanency review hearings were held in May and August 2021 and February and May 2022. At the 2021 review hearings, Mother's compliance with her family service plan was substantial/moderate and her progress was considered minimal/moderate, respectively. N.T. Termination Hearing, 8/30/22, at 4. CYS had a bonding assessment conducted of Mother and Children in June 2021, which indicated that "Mother appeared to be struggling with balancing her energies and multitasking between the two needy children[,] . . . [that Mother] would hold the[] boys facing them away [from her during visits,]. . . [that Mother] wouldn't make frequent physical contact with [Children,] . . . and that [C]hildren did not yearn after [Mother] when it was time for [her] to leave [visits]." *Id.* at 27. At the 2022 review hearings, Mother's compliance was noted as moderate and her progress minimal. *Id.* at 4-5. In May 2022, visitation ceased and the permanency goal was changed from reunification to adoption. On July 8, 2022, CYS filed petitions to involuntarily terminate Mother's rights to Children.

_____

The service plan was again revised in April 2022 to add the following: notify CYS within 7 days of any employment or employment schedule change and a weekly ten-minute phone call with Children. *Id.* at 9-10.

On August 30, 2022, the court held a termination hearing that incorporated the record in the underlying dependency proceeding. At the time of the termination hearing, Children had been in placement for 18 months. CYS caseworker Sallack and Erin Landeni-Rogan, Father's therapist through the Erie County Probation Department, testified at the hearing.[8] On September 6, 2022, the trial court granted CYS' petition and terminated Mother's parental rights[9] pursuant to sections 2511(a)(2), (5), (8), and (b) of the Adoption Act.[10] Mother filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, Mother presents the following issues for our review:

(1)  Whether the trial court made an error of law or abused its discretion in terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(a)(2)[.]

(2)  Whether the trial court made an error of law or abused its discretion in terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(a)(5)[.]

---

[8] Children were represented by guardian *ad litem*, Greg Sobol, Esquire, and attorney, Danielle Melillo, Esquire, at the termination hearing. **See** 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 200 A.3d 969 (Pa. Super. 2018) (en banc (same)

[9] The trial court also involuntarily terminated the parental rights to Children's biological father, A.G, who has also filed an appeal. **See In Re: W.A.S.** & **J.L.S.**, Nos. 1172 & 1173 WDA 2022. A.G.'s appeal will be addressed in a separate decision.

[10] 23 Pa.C.S.A. §§ 2101-2938.

(3) Whether the trial court made an error of law or abused its discretion in terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(a)(8)[.]

(4) Whether the trial court made an error of law or abused its discretion in terminating [Mother's] parental rights under 23 Pa.C.S.A. § 2511(b)[.]

Mother's Brief, at 6.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts [which] often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 6 -

J-S05017-23

Instantly, the trial court terminated Mother's parental rights pursuant to sections 2511(a)(2),[11] (5), (8), & (b).[12] We need only agree with the Orphans' Court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm its termination decree. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

_____

[11] Subsection 2511(a)(2) states:

**(a)** *General rule.* — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> **(2)** The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and **the conditions and causes of the incapacity, abuse, neglect**[,] **or refusal cannot or will not be remedied by the parent.**

23 Pa.C.S.A. § 2511(a)(2) (emphasis added).

[12] Subsection 2511(b) states:

**(b)** *Other considerations.*--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a) … (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

- 7 -

Mother contends that there is no permanent incapacity that would cause Children to be without essential care and control to justify terminating her parental rights under subsection 2511(a)(2). Specifically, Mother claims that: she was always prepared and "did a majority of the work" for Children at visits; she successfully completed a parenting program in September 2021; she was never offered "a refresher course or a different experiential course tailored to . . . parenting twin boys;" and, her parental deficiency or incapacity has "not been proven to be so permanent as to warrant termination of her rights." Mother's Brief, at 9-10.

To satisfy the requirements of subsection 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and **continued incapacity, abuse, neglect, or refusal**; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) **the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied**. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (emphasis added). The grounds for termination of parental rights under subsection 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; the grounds may also include acts of refusal, as well as incapacity to perform parental duties. *In the Interest of A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

Instantly, the trial court concluded that:

[w]hile Mother [] began the dependency process, [she] lacked many of the most basic parenting skills, and neither time nor education has changed that. . . . [She was] unable to transfer book knowledge to real life[.] After more than a year of supervised visits, [she] still could not anticipate the [Children's] needs[, she] could not recognize signs of hunger and satiety[, she] had to be continually reminded to check diapers[,] and [she] failed to appreciate that toddlers playing on above-ground surfaces needed to be monitored or redirected. [She] further failed to comprehend the importance of staying actively engaged with [C]hildren when their time together was so limited, frequently focusing their attention on things that interested [*her*] rather than on the twins.

Trial Court Opinion, 9/6/22, at 2 (emphasis in original). The record supports the trial court's conclusions and, therefore, supports termination under subsection 2511(a)(2).

Although Mother completed parenting classes as part of her family service plan, CYS caseworker Sallack testified Mother did not "demonstrate" the skills that she had learned in those classes during visits with Children. *See* N.T. Termination Hearing, 8/30/22, at 14, 34, 41 (CYS caseworker testifying Mother unable to "transfer" learning skills to nurturing Children); *id.* at 22, 35, (CYS caseworker had to tell Parents "every step of the way" what to do for Children at visits). Moreover, Sallack testified that because Mother completed the parenting course casework, she did not need to "retake" any parenting classes as a "refresher."

Simply put, in the 18 months since Children have been removed from Mother's care, Mother has been incapable during visits of properly supervising, caring for, and tending to the needs of Children without the constant intervention and instruction of CYS caseworkers. *See* 23 Pa.C.S.A. §

- 9 -

2511(a)(2) ("the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied"); *see also In re M.E.P.*, *supra* at 1272. In fact, Mother's visits have never progressed beyond supervised due to safety concerns. *See* N.T. Termination Hearing, 8/30/22, at 66 (CYS never felt comfortable lessening visit restrictions based on safety concerns posed to Children); *id.* 65 (Caseworker Sallack testifying she would not be comfortable with Mother being with Children unsupervised or confident that Children would be safe alone with Mother); *id.* at 14-15 (Caseworker Sallack testifying Mother did not know when Children needed diaper changes or feedings during visits).

This case is much more than an example of "gaps" in Mother's parenting of Children as Mother's attorney would have us believe. *Id.* at 78. Mother's admitted criminal acts inflicted on J.L.S. led to Children's removal from her care and, even with consistent "hands-on" parenting instruction for over one year, Mother has been unable to prove that she can put those lessons into practice and carry out parenting responsibilities. Without more, Children are at risk physically and emotionally. Accordingly, Mother's inability to utilize the skills she learned during the parenting classes and apply them to parenting Children justifies termination under subsection 2511(a)(2).

Mother next contends that the trial court abused its discretion terminating her parental rights under subsection 2511(b) because the court "wrongfully concluded that there were not sufficient bonds worth preserving between Mother and [C]hildren, by failing to not only evaluate the existing

bonds, but also by failing to adequately weight the effects of their severance."

Mother's Brief, at 13. We disagree.

> [Subs]ection 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re J.N.M.*, 177 A.3d 937, 943-44 (Pa. Super. 2018) (citation omitted).

Here, CYS **did** have a bonding assessment conducted of Mother and Children in June 2021. CYS caseworker Sallack testified that the doctor who performed the assessment was most concerned with "the observed poverty of emotional interaction between [Mother] and her two sons." N.T. Termination Hearing, 8/30/22, at 28. Moreover, the assessor noted that "[a]t the current time, [Children] do not appear to have either a strong or secure emotional bond with [Mother]." *Id.*

CYS caseworker Sallack testified that after participating in Mother's visits with Children for a year and a half, she never observed a secure emotional bond between Mother and Children. *Id.* Rather, the caseworker

- 11 -

noted that while Children were "friendly" and "familiar" with Mother during visits, when Children would return to their foster home, the Children would be "so excited" to see their foster parents, "run[ning,] giggling[,] and laughing." *Id.* CYS caseworker Sallack further testified that Children "appear very bonded" with foster parents and the entire foster family, that Children "are starting to say [and refer to foster parents as] dadda and mama," and that foster parents are providing for Children's needs. *Id.* at 28-29.

Here, the record supports the conclusion that Children do not have an established bond with Mother. Instead, the evidence demonstrates that Children have a parent-child bond with their foster parents, who are an adoptive resource. *See* Trial Court Opinion, 9/6/22, at 3 ("The [foster parents] are the people they love, the people they greet with excitement, and the people with whom they have developed family-like bonds."); *see also In re J.N.M.*, *supra*. Accordingly, we conclude that the trial court did not abuse its discretion in determining that termination of Mother's parental rights would best serve the developmental, physical, and emotional needs and welfare of Children. *See* 23 Pa.C.S.A. § 2511(b).

Decrees affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/2023